Filed 1/22/14 In re D.F. CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re D.F., a Person Coming Under the Juvenile Court Law. | |
| RIVERSIDE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, | E058472 |
| Plaintiff and Respondent, | (Super.Ct.No. SWJ1200427) |
| v. | OPINION |
| K.F., | |
| Defendant and Appellant. | |

APPEAL from the Superior Court of Riverside County. John M. Monterosso, Judge. Affirmed as modified.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Pamela J. Walls, County Counsel, and Julie Koons Jarvi, Deputy County Counsel, for Plaintiff and Respondent.

1

## I. INTRODUCTION

K.F. (mother) appeals from a visitation order with respect to her daughter, D.F. (born in 2000), entered at a special interim review hearing. Mother contends the juvenile court improperly delegated authority to determine visitation to D.F. and her therapist. We affirm as modified.

## II. FACTS AND PROCEDURAL BACKGROUND[1]

In June 2012, the Riverside County Department of Public Social Services (Department) filed a petition under Welfare and Institutions Code[2] section 300, subdivisions (b) (failure to protect) and (c) (serious emotional damage. The detention report stated that mother had taken D.F. to the hospital, insisting she suffered from tetanus, although it was determined she did not in fact have the disease. Mother stated D.F. had thrown up a large amount of blood, but D.F. denied that. She stayed in the hospital six days and was diagnosed with conversion disorder (a condition in which "a person has symptoms in response to emotional abuse") and eating disorder. She refused to eat in the hospital; and her nutritional levels were so low that if she left the hospital she would need to be readmitted within 24 hours. She reported that she had been physically abused by mother and verbally abused by mother and mother's boyfriend. She said mother's boyfriend had given her a cell phone that contained naked pictures of him and

---

[1] We have taken judicial notice of our record in mother's appeal in case No. E058277, and we refer to the documents in that case as "CT" and "RT." We refer to the documents in the current case as "1CT" and "1RT."

[2] All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

other women, and he walked around naked. She also said she had heard mother and mother's boyfriend having sex. During D.F.'s hospital stay, mother was observed yelling and screaming at D.F. and standing over her with clenched fists. D.F. said she would rather be dead than go home with mother. She told the social worker she did not want to see mother "'ever again,'" stating, "'I'm afraid of her. She tells me that she wants me dead and that I am the worse [*sic*] thing that ever happened to her. She told me that she would have gotten rid of me but it was too late. She scares me.'" D.F.'s symptoms disappeared when mother was asked to leave the hospital.

A doctor who treated D.F. at the hospital telephoned mother to tell her that D.F. would be ready for discharge and asked mother to meet with her. Mother responded that she could not come because she was folding laundry, and she later said she did not have the gas money. When D.F. "continued to scream and run around the hospital in fear of the mother coming to pick her up," she was taken into protective custody. Mother denied calling D.F. names or physically abusing her; however mother admitted her boyfriend called D.F. names. Mother denied that D.F. had heard her and her boyfriend having sex.

At the detention hearing on June 7, 2012, the juvenile court found a prima facie showing had been made. The court ordered that visitation with mother would be detrimental to D.F., and it ordered no visitation. The court ordered reunification services for mother. However, the court trailed the hearing to June 11 to allow mother to hire a private attorney. At the continued detention hearing, the court again found a prima facie showing and ordered supervised visitation once weekly in a therapeutic setting.

3

The Department filed a jurisdiction/disposition report in on June 27, 2012. The social worker had met with D.F., who "started to hyperventilate and . . . cry hysterically" when asked about visitation. A public health nurse was called into the interview, and he determined that D.F.'s pulse was low and recommended she be seen by a doctor in the next few days. She denied being bulimic or anorexic, but she said she had an eating disorder. She told the social worker she did not want to see her mother because they were very close, and if she saw her mother, she would want to go home with her, but she was not ready to do so. She stated she might be ready to see mother in two months. She stated she loved mother, but mother was abusive.

Mother's roommates told the social worker they believed D.F. was well cared for and that they did not believe her allegations because they had known her to lie and make up stories.

The social worker reported that no visitations had taken place because D.F. did not want to visit mother. The social worker recommended that both mother and D.F. receive psychological evaluations and participate in counseling and conjoint counseling and that any visitation take place in a therapeutic setting.

At a hearing on July 2, 2012, in addressing visitation, the court stated: "I'm not trying to prejudge anything until I hear all the evidence. Obviously, [D.F.'s] reaction at the mention of mom's name is a violent physical reaction, wasn't simply, 'I don't feel like seeing mom.' It was extremely detrimental to her emotional state. Whether visitation takes place or not is something that needs to be done delicately with

4

professionals assessing the situation. I agree, if a therapist feels it's appropriate, the child can emotionally handle a visit with mom, by all means, I'm supportive of that."

The Department filed an addendum report on July 27, 2012. D.F. had been in the hospital from July 11 until July 13 because she refused to eat. She told the social worker she would be willing to visit with mother "only if someone was right there with her," although she also said she missed mother and wanted to go home if she saw proof that mother had changed. She also said she probably would have a nervous breakdown if she visited mother. D.F.'s foster mother reported that D.F. had lied about family members having been killed in a car accident and about being able to wear only certain brands of shoes because of foot surgery, among other things. The foster mother said that D.F. lied so much she had to have someone else there when she talked to her because she was afraid D.F. would make false allegations.

The Department filed a report of mother's psychological evaluation. The psychologist determined that mother did not meet the criteria for Munchhausen's Syndrome by Proxy, but that mother had a personality disorder leading to an "emotionally charged situation between herself and minor . . . such that minor shows symptoms of a conversion disorder and when mother is not present, those symptoms dissipate." The psychologist concluded, "I would be cautious in this reunification process which is going to require extensive therapy with minor and with client. I would not force the issue of contact between them until such time as each therapist agrees that it would be appropriate and then it should first be done in a therapeutic session with each therapist present and involved."

5

At the jurisdictional hearing, the juvenile court found true allegations under section 300, subdivision (b). The court ordered reunification services for mother and ordered that "[p]rior visitation orders remain in full force and effect."

On October 24, 2012, mother's counsel filed an ex parte application for therapeutic visitation between mother and D.F. In response, the Department recommended that all visits between mother and D.F. be suspended "as they are detrimental [to] the emotional well-being of [D.F.]" D.'s therapist provided a letter stating that she did not feel D.F. would benefit from family therapy with mother.

On November 14, 2012, the juvenile court held a hearing on the application. Mother's counsel informed the court that D.F. did not want to have visits with mother, either in person or by telephone. Counsel continued, "Essentially, for the most part, I'm withdrawing my request, since at this point, I don't expect it to happen based on everyone's comments on the issue. I would essentially withdraw the request for visitation, immediate visitation, therapeutic visitation with the minor, but I'm still going to request authorization for therapy and visits when appropriate."

Counsel for the Department noted the current visitation order called for once-weekly visits and requested the court to modify that order. The court responded, "I don't want to be in a position where we take that off the table, so [D.F.] is not at least considering that option. None of us will be able to sit in on the therapy sessions with her to make sure the therapist is dealing with that issue. I think it needs to be dealt with. I think it's critical. But if you harp on her, ask her every week, it may well cause her to dig in and turn off. I'm sort of the mind to simply modify the order that they can suspend

6

visitation until recommended by the therapist. Makes all the sense in the world. Once there is a breakthrough, the Department can start making arrangements." Mother's counsel asked if the court was "continuing to authorize therapeutic visits[.]" The court responded, "Yes. Basically conjoint therapy, not necessarily therapeutic visits, but conjoint therapy." Mother's counsel submitted "on [his] previous comments." The court ordered: "As to visitation, I'll simply find that visitation at this point in time between [D.F.] and her mom will be suspended until recommended by the therapist. I'll continue to authorize conjoint therapy between the mother and child upon the therapist's recommendation for that to occur." The court's minute order "authorize[d] conjoint therapy between the mother and the minor when deemed appropriate," and stated, "[V]isitation is suspended until recommended by the therapist that visits resume."

The Department filed a six-month status review report in January 2013. Mother was living with a family friend and was employed 20 to 30 hours a week as a cashier at a Target store. She completed a psychological evaluation and had been attending regular counseling appointments. Her therapist requested a second psychological evaluation of her.

D.F. was continuing to attend counseling sessions. Her therapist recommended that no contact take place between D.F. and mother because D.F. "continue[d] to report past abusive incidents committed on her by the mother and the mother's boyfriends." D.F.'s caretaker reported that D.F. did not have an eating disorder and she maintained a healthy appetite, although she sometimes did not eat when she was upset. D.F. expressed animosity toward mother and became anxious when visitation or phone calls with mother

7

were mentioned. The Department filed a report of D.F.'s psychological evaluation which stated, "[D.F.] is experiencing a heightened degree of depression, anxiety and posttraumatic patterns which are consistent with her descriptions of the severe physical and sexual trauma when with her mother. . . . It is quite evident she will be traumatized even by having any contact with her mother." There were no indications of psychosis, and D.F. felt safe and secure in her current placement.

At the review hearing in January 2013, mother's counsel stated, "Finally, your Honor, in regard to the request, at this point, mother has not had visitation because the child does not want to have visitation. The request in the addendum that was provided to us at the last court date mentioned earlier asks that all visits be suspended. I don't believe there's a need for visits to be suspended, because they are not happening. When visits are ready, we want to be able to have visitation. Mother would like visitation. I'm not sure what more we can do to facilitate visitation. The child continues to go to therapy, continues to indicate she doesn't want to visit." Mother's counsel stated that mother's "request for today" was that mother's therapist and D.F.'s therapist communicate in an attempt "to make some steps forward in this matter."

The court stated: "[Mother's counsel] raises the point that I've been thinking about as well. Because we're in this phase now, that if visits never take place, then the result is preordained, that is, mom and child will never be reunified. This Court always gives great deference to the professional opinion of therapists, in particular therapists who will recommend that a child who is suffering like [D.F.] has suffered to defer to that child's wishes regarding visitation with that parent. But I'm not satisfied from the

8

information I have as to weighing out the downside of forcing the issue, if you will, therapeutic visit to see how the child reacts versus what I believe is a preordained result, which is failure to reunify if there aren't some visits if there isn't an attempt. Waiting for the child to be ready, we may wait forever. I don't know. I don't know the answer to that. [¶] I think the first thing [mother's counsel] suggested, I thought was a very valid suggestion, which is to get both therapists together to at least discuss a plan, and I don't intend to order a visit or a therapeutic visit, but I do want to monitor this. Otherwise, we're likely to come back in six months with no new information." The court stated: "I also intend to keep the current visitation order in place, but order that the Department facilitate communication between the two therapists, mom's therapist and child's therapist for the purpose of developing a plan to lead to conjoint therapy within the foreseeable future, which by our definition would be in the next six months." The court set the matter for a special review hearing to take place in two months "so we can see how things are going and I can get more direct information from the therapist on this subject."

The Department filed an interim review report in March 2013. The social worker stated that D.F. had "'googled her name'" on a school computer, and she found a "'Child Alert'" that contained personal information about the current case. It named the agency of D.F.'s current caretakers, the counseling agency, and the names of D.F.'s therapist and attorney. D.F. became hysterical on seeing the report, and she was terrified that mother had so much information and "would come and 'get her.'" The information had apparently come from the Department's previous report that had been provided to

9

mother.  The social worker located more information about the case on the internet; one website article contained an "'encrypted message with numbers and symbols'" and asked that it be provided to D.F.

Mother denied all of the sexual abuse allegations that D.F. had disclosed in therapy and stated she believed D.F. had had ideas put into her head by other girls at the foster home.

In March 2013, D.F. provided the Department a letter, addressed to the "Judge," in which she stated her reasons for not wanting to have any contact with mother.  Those reasons included that mother had beaten her, called her names, forced her to have sex with men, and threatened to "hang [her] body on a telephone pole and burn it or tie [her] hair to the fan of the car engine" if she told anyone.

The Department filed an addendum report in March 2013.  The social worker reported that arrangements were underway to increase D.F.'s therapy sessions to once weekly.  The Department had received a telephone message from an FBI agent who reported that mother was trying to file a missing person report on D.F.  The Department informed the agent that D.F. was a dependent child of the court.  The social worker also reported that mother's therapist and D.F.'s therapist had not yet spoken.  D.F.'s therapist provided a letter stating that D.F. did not want her to communicate with mother's therapist.

At the special hearing in April 2013, the court questioned D.F. in chambers about her willingness to visit with mother, among other things.  Following the hearing, the court left the visits as "status quo" and authorized D.F.'s and mother's therapists to

communicate in the event D.F. "decide[d] to allow that waiver [of confidentiality] to take place as well as an authorization for visits if [D.F.] makes progress in her therapy to where she's open to having contact visits with mom or extended maternal family."  The court's minute order stated, "Prior visitation orders remain in full force and effect," and "Court authorizes minor to have visitation with mother only if the minor is open to it."

## III.  DISCUSSION

Mother contends the juvenile court unlawfully delegated authority to determine visitation to D.F. and her therapist.

We review the juvenile court's order setting visitation terms for abuse of discretion.  (*In re Brittany C.* (2011) 191 Cal.App.4th 1343, 1356.)

When a child is placed in out-of-home care after a dispositional hearing and the court orders reunification services for the parent, the court's order must provide for visitation "as frequent as possible, consistent with the well-being of the child."  (§ 362.1, subd. (a)(1)(A).)  The determination of the right of visitation is part of the judicial function and must be made by the court.  (*In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1008-1009.)  The juvenile court may not delegate to any third person, including the child, a social worker, or a therapist, unlimited discretion to determine whether visitation is to occur.  (*In re S.H.* (2003) 111 Cal.App.4th 310, 318.)

It is improper to deny visitation in the absence of a showing of detriment to the child (*In re Mark L.* (2001) 94 Cal.App.4th 573, 580; *In re S.H.*, *supra*, 111 Cal.App.4th at p. 317); however, no visitation order shall jeopardize the safety of the child (§ 362.1, subd. (a)(1)(B)).  "[A] parent's liberty interest in the care, custody and companionship of

11

children cannot be maintained at the expense of their well-being. [Citation.] While visitation is a key element of reunification, the court must focus on the best interests of the children 'and on the elimination of conditions which led to the juvenile court's finding that the child has suffered, or is at risk of suffering, harm specified in section 300.' [Citation.] This includes the 'possibility of adverse psychological consequences of an unwanted visit between mother and child.' [Citation.]" (*In re Julie M.* (1999) 69 Cal.App.4th 41, 50.)

Case law is unclear as to the standard of review that applies to a juvenile court's determination that visitation would be detrimental to the child. For example, in *Mark L.*, the juvenile court made such a finding by clear and convincing evidence. (*In re Mark L.*, *supra*, 94 Cal.App.4th at pp. 580-581.) However, in *In re Manolito L.* (2001) 90 Cal.App.4th 753, 761-762, the court held that the preponderance of the evidence test applies.

Here, although the juvenile court made no express finding of detriment, such a finding may be implied based on the extensive discussions of the subject in the various reports and at the hearings. Moreover, such an implied finding, whether reviewed under clear and convincing evidence or by a preponderance of the evidence, is amply supported by the evidence in the record regarding D.F.'s extreme agitation and anxiety when the subject of visitation was even raised and regarding the recommendations of both mother's and D.F.'s therapists, as recounted above in the statement of facts.

We therefore review the order in the context of whether it improperly delegated authority to D.F. and her therapist to set conditions for the commencement of visitation.

12

As noted, "[t]he juvenile court has the sole power to determine whether visitation will occur and may not delegate its power to grant or deny visitation to the [social services agency]. . . . Only when the court delegates the discretion to determine whether any visitation will occur does the court improperly delegate its authority and violate the separation of powers doctrine. [Citations.]" (*In re Christopher H.*, *supra*, 50 Cal.App.4th at pp. 1008-1009.)

In *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, the juvenile court order stated, "'no visitation rights without permission of minors' therapists.'" (*Id*. at p. 1477.) The appellate court held the order was improper because it did not include any criteria, such as satisfactory progress, to inform the therapists when visitation would be appropriate; rather, the order left visitation to the therapists' sole discretion. (*Ibid*.) However, in *In re Chantal S.* (1996) 13 Cal.4th 196, 203-204, the court approved an order requiring that visitation for the father be facilitated by the minors' therapist when the father had made satisfactory progress.

In *In re Nicholas B.* (2001) 88 Cal.App.4th 1126, the juvenile court first suspended visitation between the child and parents and later stated that visitation would not occur until the child's therapist expressed support for visitation, after which visitation would take place one hour per month, supervised at the social worker's discretion. (*Id.* at p. 1138.) The appellate court agreed that the order gave too much discretion to the therapist and failed to require visitation as a necessary part of family reunification. (*Ibid.*) Similarly, in *Julie M.*, the court held that the juvenile court abused its discretion in giving the children absolute discretion to decide whether their mother could visit them

13

because "[t]he order essentially delegated judicial power to the children—an abdication of governmental responsibility which was disapproved" in prior cases.  (*In re Julie M.*, *supra*, 69 Cal.App.4th at pp. 48-49}

In *In re Danielle W.* (1989) 207 Cal.App.3d 1227, 1237, the court upheld an order that granted visitation "at the discretion" of the social services agency and the children and provided that the juvenile court would not order the children to visit if they did not want to.  (*Id.* at p. 1237.)  The court held that the order merely required the agency to take the children's wishes into consideration and did not give the children more than the power to "express their desires in th[at] regard."  (*Ibid.*)  However, in upholding the order, the court expressed reservations about visitation orders that did not provide guidelines as to the prerequisites for or limitations on visitation.  (*Ibid.*)  The court recognized that while a child's aversion to visiting an abusive parent could be a dominant factor in administering visitation, it could not be the sole factor.  (*Ibid.*)

In short, "[t]he juvenile court must first determine whether or not visitation should occur . . . and then provide the Department with guidelines as to the prerequisites of visitation or any limitations or required circumstances."  (*In re Danielle W.*, *supra*, 207 Cal.App.3d at p. 1237, fn. omitted.)  Here, on November 14, 2012, the trial court ordered, "As to visitation, I'll simply find that visitation at this point in time between [D.F.] and her mom will be suspended until recommended by her therapist."  On January 31, 2013, the court stated it intended to keep the current visitation order in place.  On April 2, 2013, the court stated it intended to keep the order "status quo" as to visitation but authorized visits if D.F. made progress in her therapy to where she was open to having visitation.

14

That order, like those found improper in the cases discussed above, allows visitation only when D.F. is "open" to it, rather than requiring a determination, based on the progress of her therapy, that conditions might arise under which visitation would cease to be detrimental to her, even if she does not wish for visitation to occur. Thus, while we affirm the order suspending visitation, we will remand for the juvenile court to enter an order giving guidance on the conditions under which visitation may commence and any limitations or required circumstances for such visitation.

## IV. DISPOSITION

The juvenile court is directed to enter an order giving guidance on the conditions under which visitation may commence and any limitations or required circumstances for such visitation. In all other respects, the order appealed from is affirmed.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
J.

We concur:

RAMIREZ
P.J.

CODRINGTON
J.

15